IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BERNADETTE DAVID, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No. 11 C 3720 |
| ) | |
| PATRICK R. DONAHOE, ) | Judge John Z. Lee |
| POSTMASTER GENERAL, ) | |
| UNITED STATES POSTAL SERVICE, ) | |
| (Great Lakes Area), Agency, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Bernadette David, a former supervisor with the United States Postal Service ("USPS"), has sued Patrick R. Donahoe, the USPS Postmaster General (Great Lakes Area), alleging that she was demoted from supervisor to part-time mail handler because she is a woman in violation of Title VII of the Civil Rights Act ("Title VII"). Donahoe has moved for summary judgment arguing that Plaintiff was reduced in grade not because of her gender but because she repeatedly falsified other employees' time records, which caused the USPS to pay those employees for time Plaintiff knew they did not work, and that Plaintiff later lied about doing so. For the reasons stated herein, the Court grants Donahoe's motion.

### Facts

The following facts are undisputed.

I.  **David's Demotion**

Beginning in February 2006, Plaintiff Bernadette David was a supervisor at the USPS Graceland Postal Station in Chicago, Illinois. (Def.'s LR 56.1(a)(3) ¶ 5.) As a supervisor, David oversaw subordinate employees, including clerks, sales and service associates, and mail

1

handlers, all known as craft employees. (*Id.* ¶¶ 5, 9-10.) Craft employees track their work time in the USPS's electronic Time and Attendance Collection System ("TACS") database by swiping a time card through an electronic badge reader when they begin their shift, go to or return from lunch, and end their shift. (*Id.* ¶ 12.) The TACS database also allows supervisors to make manual entries and edits to employees' time. (*Id.*)

In January 2008, the USPS Office of Inspector General ("OIG") received an anonymous telephone call alleging that David allowed craft employees to leave early and that she later manually edited their work time in TACS to reflect that they had worked a full day. (*Id.* ¶ 13.) The caller identified Elizabeth Batten, Joseph Young, and Renee Pittman as the craft employees whose time David edited. (*Id.* ¶¶ 10, 13.)

On January 30, 2008, USPS OIG special agents Michelle Goldsmith and Penelope Mundo investigated the allegations against David by conducting surveillance around the Graceland facility. (*Id.* ¶¶ 11, 14.) At approximately 12:18 p.m., Goldsmith and Mundo observed Batten and Pittman leave the facility. (*Id.* ¶ 15.) The next day, Goldsmith and Mundo reviewed the TACS entries for January 30, 2008, and learned that Batten and Pittman last swiped their electronic badges at 11:51 a.m. (*Id.* ¶ 16.) Their swipes were entered as a "move," not an "end." (*Id.*) That same day at 6:00 p.m., Gregory Carothers, who was the acting supervisor at Graceland (David was not at work that day), manually changed Batten and Pittman's 11:51 a.m. "moves" to "ends." (*Id.* ¶¶ 17-19.)

On February 7, 2008, Goldsmith and Mundo again reviewed the TACS entries for January 30, 2008. (*Id.* ¶ 20.) They learned that on February 2, 2008, David had returned to work, entered the TACS database, and deleted the January 30, 2008 end times for Batten and Pittman previously entered by Carothers. (*Id.* ¶ 19.) David had also manually entered new end

times of 1:30 p.m., bringing Batten and Pittman's work time for January 30, 2008, to a full eight-hour day. (*Id.* ¶¶ 20, 22.[1]) David did not ask Batten or Pittman whether they had worked eight hours on January 30, 2008, before she changed their time entries for that day. (*Id.* ¶ 23.[2])

On May 23, 2008, Goldsmith and Mundo interviewed David about the allegations that she allowed craft employees to leave work early and manually adjusted their TACS entries so that they would be paid for a full eight-hour day. (*Id.* ¶ 25.) David told them that she did not have an arrangement with the craft employees to adjust their time entries and that she would not enter an end time reflecting that an employee had worked an eight-hour day when she knew the employee had left early. (*Id.*) In a sworn written statement she provided that day, David stated that her duties at Graceland included correcting time-entry errors and that the manual entries she made for Batten, Pittman, and Young were done to correct errors on those occasions when the employees were sent to other offices for supplies, delivered express mail, or took reports downtown. (*Id.* ¶ 26.) Her written statement reiterated that she "never knowingly ended tours for those employees who were not working" and that she corrected time-entry irregularities only after speaking with the employee and or a supervisor. (*Id.*)

Goldsmith and Mundo also interviewed Batten and Pittman. (*Id.* ¶¶ 27-28.) At the end of her interview, Batten provided a sworn written statement in which she admitted that "David

---

[1] Plaintiff denies Defendant's LR 56.1(a)(3) ¶ 22, but "a general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial." *See Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). Plaintiff's denial reads: "David knew that the employee was at work on the day in question being January 30, 2008." Pl.'s LR 56.1(b)(3)(B). Plaintiff does not deny that David's change to Batten and Pittman's time for January 30, 2008 brought their January 30, 2008 work time to a full eight hours. Thus, this fact is deemed admitted for the purposes of this motion.

[2] In her response to Defendant's LR 56.1(a)(3) ¶ 23, Plaintiff admits "David adjusted a clock ring to show that eight hours were worked without even checking with the employee to see if he or she actually worked the full eight hours." Pl.'s LR 56.1(b)(3)(B) ¶ 23. Thus, this fact is deemed admitted for the purposes of this motion.

3

said we all can go home before our tour is over [and] we submit a 1260 if we can find one and go home. The 1260 is for end of tour, which insure[s] a 8 hr day, [e]ven thou [sic] we might do [a] 6 or 7 hr. day." (*Id.* ¶ 27; *id.*, Ex. J, Sworn Statement of Elizabeth Batten 2.) Batten also stated that "[t]his is a normal practice because the other [supervisors] let us do it to [sic]." (*Id.*) Pittman echoed Batten and told Goldsmith and Mundo that David allowed clerks to leave early and would later manually clock them out for a full eight-hour day. (Def.'s LR 56.1(a)(3) ¶ 28.[3])

On June 4, 2008, Goldsmith and Mundo interviewed David again. (*Id.* ¶ 29.) They told her that they had interviewed Batten and Pittman and that Batten and Pittman had told them that David did allow clerks to go home early and manually entered end times for the clerks to reflect eight hours of work. (*Id.*) David again stated that if she had manually entered end times, she was simply "cleaning up" errors, not inflating hours and pay. (*Id.*)

Goldsmith then issued a United States District Court Violation Notice to David for providing false statements during a federal investigation. (*Id.* ¶ 30.) The Notice stated that on May 23, 2008, David provided a sworn written statement in which she averred that she did not clock employees out when they were not working, but that subsequently interviewed employees gave sworn statements of their own stating that David had in fact allowed them to leave early and had clocked them out at a later time. (*Id.*, Ex. M, Violation Notice 2.) The citation gave David the option of paying a $75.00 forfeiture amount or contesting the charges in court. (*Id.* ¶ 30.) On June 16, 2008, David paid the $75.00. (*Id.*)

---

[3] Plaintiff denies Defendant's LR 56.1(a)(3) ¶ 28, but states only: "Deny. Pittman advised Special Agents Goldsmith and Mundo that all supervisors allowed clerks to leave early." Pl.'s 56.1(b)(3)(B) ¶ 28. This general statement does not deny Defendant's assertion that David allowed clerks to leave early and then manually adjusted their time entries to reflect that they had worked a full eight-hour day. As a result, that fact is deemed admitted for the purposes of this motion.

4

Following the OIG's investigation, a report was provided to David's supervisor, USPS Area Manager Daniel Davis. (*Id.* ¶¶ 32-33.[4]) Davis reviewed the OIG report and David's manual TACS entries and took statements from witnesses. (*Id.* ¶ 34.) Davis concluded that: (1) there was an agreement between David and three craft employees pursuant to which David allowed the craft employees to "steal time" by rewarding a shortened work day with eight hours of pay; (2) David improperly manipulated employees' time entries; and (3) David lied about doing so to Goldsmith and Mundo. (*Id.* ¶¶ 37-38, 40.) Davis determined that David should be removed from her position. (*Id.* ¶ 43.)

On September 23, 2008, Davis sent David a Notice of Proposed Removal. (*Id.* ¶ 44.) The Notice recounted the OIG investigation and charged David with (1) Improper Recording and Adjustment of Postal Service Timekeeping Records; and (2) Giving False Statement During a Time and Attendance Federal Investigation. (*Id.*) David appealed the proposed removal to Keith Pugh, the Executive Post Office Operations Manager in the Chicago District. (*Id.* ¶¶ 7, 45.) In a letter by David's representative to Pugh, David denied both charges. (*Id.* ¶ 47.)

On December 12, 2008, David and her representative met with Pugh. (*Id.* ¶ 48.) David again denied the charges. (*Id.* ¶¶ 49-50.) Pugh suggested that David confer in private with her representative, and Pugh left the room. (*Id.* ¶ 51.) When Pugh returned, David admitted to purposefully changing clock rings, telling Pugh that "it was common practice that all of the supervisors did the same as [she] did where they manually went in the system and they placed in end tours or begin tours or deleted rings the same as [she] did." (*Id.* ¶ 52.) David did not admit,

---

[4] Defendant's LR 56.1(a)(3) ¶ 33 states that "[b]ecause there was no manager at Graceland, Area Manager Davis was both David's immediate and second-level supervisor." Def.'s 56.1(a)(3) ¶ 33. Plaintiff denies Defendant's assertion and states that "Davis was the acting manager and David's area supervisor." Pl.'s 56.1(b)(3)(B) ¶ 33. Thus, Plaintiff disputes Defendant's contention that there was no manager at Graceland, but not Defendant's contention that Davis was Plaintiff's supervisor. Accordingly, the fact that Davis was Plaintiff's supervisor is deemed admitted for the purposes of this motion.

5

however, that the time-entry changes she made were improper. (Pl.'s LR 56.1(b)(3)(C) ¶ 23.[5]) Instead, she reiterated her assertion that she had never allowed employees to leave early and then manually changed their time entries to reflect that the employees had worked a full day. (Def.'s LR 56.1(a)(3) Ex. E, David Dep. 40:1-14.) Pugh concluded that, although David had not been truthful with the OIG, Davis, or himself, she nevertheless could still be a productive USPS employee in a position that did not involve the trust required of a supervisor. (Def.'s LR 56.1(a)(3) ¶ 58.) Therefore, instead of removing David, Pugh demoted her to a mail handler. (*Id.* ¶ 59.)

## II.  Other USPS Employees Who Received Discipline Due to TACS Related Conduct

In April 2008, Henry Solomon, the acting manager of the Edgebrook Carrier Annex, a USPS facility in Chicago, received a Notice of Proposed Reduction in Grade from Lynette Smith. (*Id.* ¶ 61.) The Notice alleged that Solomon had falsified timekeeping records and proffered false information during a USPS investigation. (*Id.* ¶ 62.) After initially providing false information about the time-entry changes, Solomon provided truthful information to Smith and the OIG agents. (*Id.* ¶ 64.)

Solomon appealed his proposed reduction in grade to Pugh. (*Id.* ¶ 65.) When he met with Pugh, Solomon fully admitted that he was wrong for making the time-entry changes and expressed remorse. (*Id.* ¶¶ 66-67.) Solomon said he made the changes because the craft employee had worked unauthorized penalty overtime, so Solomon changed the entry to reflect regular overtime. (*Id.* ¶ 66.) Pugh believed Solomon's explanations were complete and truthful. (*Id.* ¶ 65.) Pugh reduced Solomon's proposed reduction in grade to a "last chance agreement,"

---

[5] Plaintiff titles her statement of undisputed facts as "Plaintiff's Local Rule 56.1(a)(3) Statement of Undisputed Material Facts." Local Rule 56.1, however, provides for the party opposing summary judgment, here Plaintiff, to set forth additional facts in a 56.1(b)(3)(C) statement. Thus, Plaintiff's additional facts are referenced here as Pl.'s LR 56.1(b)(3)(C).

pursuant to which Solomon's grade was not reduced because Solomon admitted his wrongdoing and expressed remorse. (*Id.* ¶ 67.) The agreement also stated that if Solomon violated the agreement, he would be reduced in grade. (*Id.*, Ex. E2, Settlement and Last Chance Agreement 1.)

Pugh was involved in at least three other removal actions involving supervisors who improperly input information into TACS. (*Id.* ¶ 68.) In each of those cases, Pugh sustained the removal of the offending supervisor, including one supervisor who was male. (*Id.* ¶ 69; *id.*, Ex. Q, John Calvin Letter of Decision – Removal.)

## **Discussion**

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party has sufficiently demonstrated the absence of a genuine issue of material fact, the nonmoving party must then set forth specific facts showing there are disputed material facts that must be decided at trial. *Id.* at 321-22.

David alleges that Defendant demoted her based on her gender in violation of Title VII. Under Title VII, it is unlawful for employers "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). To overcome Defendant's motion for summary judgment, David may proceed under either the direct or indirect method of proving that Defendant took an adverse employment action against her because of her gender. *Caskey v.*

*Colgate-Palmolive Co.*, 535 F.3d 585, 591-92 (7th Cir. 2008); *Lim v. Trs. Ind. Univ.*, 297 F.3d 575, 580 (7th Cir. 2002). David cannot overcome Defendant's motion under either method.

**I.     Direct Method**

Under the direct method, a plaintiff may prove discrimination by establishing either an acknowledgement of discriminatory intent or circumstantial evidence that provides the basis for an inference of discrimination. *Overly v. KeyBank Nat. Ass'n*, 662 F.3d 856, 865 (7th Cir. 2011) (citing *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007)). The Seventh Circuit has recognized that direct acknowledgements of discriminatory intent are "rarely encountered," *Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003), because "direct evidence essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Rhodes v. Ill. Dep't Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). Without a direct acknowledgement of discriminatory intent, a plaintiff who proceeds under the direct method must put forth a "convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision-maker. *Silverman v. Board of Educ. Of City of Chi.*, 637 F.3d 729, 734 (7th Cir. 2011).

A plaintiff using the "convincing mosaic" approach may present any of three broad types of circumstantial evidence: (1) suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) evidence that the employer systematically treated other, similarly situated male employees better; or (3) evidence that the plaintiff suffered an adverse employment action and that the employer's justification is pretextual. *Id.* at 734. The appropriate focus under the direct method "is not whether the evidence offered is 'direct' or 'circumstantial' but rather whether the evidence

8

'points directly' to a discriminatory reason for an employer's action." *Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 809 (7th Cir. 2011) (quoting *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008)).

David has produced no evidence that anyone involved in the decision to demote her acknowledged a direct discriminatory intent. She has offered no statements of direct discriminatory intent, no documents containing direct discriminatory language, and no actions manifesting a direct discriminatory intent on the part of anyone involved in the decision to demote her. Although she argues that she "clearly has produced direct evidence of the clear intent to discriminate against her on the basis of her gender," (Pl.'s Resp. Br. 9-10.), conclusory statements without any supporting evidence are insufficient to prove that her case is one of those rare encounters where a decision-maker directly acknowledges discrimination. *See Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.") (quoting *Hadley v. Cnty. of Du Page*, 715 F.2d 1238, 1243 (7th Cir. 1993)).

David also argues that she has "provided circumstantial evidence that would allow a jury to directly infer gender discrimination" because she has provided evidence that she was demoted from supervisor to part-time mail handler whereas Henry Solomon, a male USPS acting manager who also improperly changed TACS time entries, was "given a slap on the wrist for the exact same conduct." (Pl.'s Resp. Br. 10.) Because this type of evidence is similar to the evidence required to prove discrimination under the indirect method, the Court addresses the inadequacy of this argument in its discussion of the indirect method below. *See Silverman*, 637 F.3d at 734; *Huff v. UARCO, Inc.*, 122 F.3d 374, 380 (7th Cir. 1997).

## II.     Indirect Method

The indirect method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-02 (1973) requires that, to survive summary judgment, David must establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she was performing well enough to meet her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated male employees. *See Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 679-680 (7th Cir. 2002). If David makes this *prima facie* showing, the burden of production shifts to Defendant to articulate a legitimate, non-discriminatory reason for David's demotion. *See McDonnell Douglas*, 411 U.S. at 802-03. If Defendant can articulate such a reason, the burden of production shifts back to David to show that Defendant's stated reason is a pretext. *See id.* In this context, a pretext is "a lie, specifically a phony reason for some action." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999). David cannot satisfy all four elements of her *prima facie* case.

As an initial matter, it is undisputed that David satisfies the first and third prongs of her *prima facie* case. As a woman, David belongs to a protected class, and she suffered an adverse employment action when she was demoted from supervisor to mail handler. Where, as here, the first and third elements of a *prima facie* case are uncontested and a plaintiff alleges that an employer disciplined employees more severely on the basis of a prohibited animus, the Seventh Circuit has held that the second and fourth elements of the *prima facie* case requirement merge. *See Rodgers v. White*, 657 F.3d 511, 517 (7th Cir. 2011); *Weber v. Univs. Research Ass'n, Inc.*, 621 F.3d 589, 594 (7th Cir. 2010). As such, the plaintiff must prove that the defendant extended leniency to similarly situated employees outside the plaintiff's protected class who engaged in similar conduct. *See Rodgers*, 657 F.3d at 517. Defendant contends that David has failed to

create a triable issue of fact that it treated similarly situated male employees who engaged in similar conduct more favorably than David. The Court agrees.

### A. Similarly Situated

Although the similarly-situated co-worker inquiry is a search for a "substantially similar employee, not for a clone," *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010), in disciplinary cases, a plaintiff must show that "the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Weber*, 621 F.3d at 594 (quoting *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002)).

David identifies Henry Solomon as a similarly-situated employee. (Pl.'s Br. 13.) In April 2008, Solomon was an acting manager of the Edgebrook Carrier Annex, a USPS facility in Chicago, when Lynette Smith issued a Notice of Proposed Reduction in Grade to him for falsifying a subordinate employee's timekeeping records and proffering false reasons for changing the records during a postal service investigation. (Def.'s LR 56.1(a)(3) ¶¶ 61-64.) Solomon appealed the proposed reduction in grade to Pugh, and Pugh reduced Solomon's proposed reduction in grade to a last-chance agreement without a reduction in grade. (*Id.* ¶¶ 65-67.) For its part, Defendant contends that Solomon is not a similarly-situated employee. The Court agrees. Although Solomon and David dealt with the same supervisor and were subject to the same standards, David has failed to create a triable issue as to whether Solomon's conduct was similar to David's.

1. **Same Supervisor**

The similarly-situated requirement normally entails the existence of a common supervisor. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). When the same supervisor treats an otherwise equivalent employee better, it can often be reasonably inferred that an unlawful animus was at play. *Coleman*, 667 F.3d at 847. The inference is weaker when there are different decision makers because they "may rely on different factors when deciding whether, and how severely, to discipline an employee." *Id.* (quoting *Ellis v. United Parcel Service*, 523 F.3d 823, 826 (7th Cir. 2008)). Because of this, a plaintiff must generally demonstrate at a minimum that a comparator was treated more favorably by the same decision-maker who took an adverse employment action against the plaintiff. *See Ellis*, 523 F.3d at 826.

Here, the common decision-maker for David and Solomon was Pugh, the Executive Post Office Operations Manager in the Chicago District. Pugh approved David's reduction in grade and Solomon's last-chance agreement. Defendant argues that David and Solomon's initial proposed discipline was from different managers because David received a Notice of Proposed Removal from Davis, whereas Solomon received a Notice of Proposed Reduction from Smith. (Def.'s Br. 13.) But under Title VII, a "decisionmaker is the person 'responsible for the contested decision.'" *Rogers*, 320 F.3d at 754. For both David and Solomon, that person was Pugh. Pugh reviewed the Notice of Proposed Removal sent to David, interviewed David regarding the Notice, and issued and signed the "Letter of Decision" reducing David's discipline to a reduction in grade. (Def.'s LR 56.1(a)(3) ¶¶ 45, 48, 53, 58-59.) Similarly, Pugh reviewed the Notice of Proposed Reduction in Grade sent to Solomon, interviewed Solomon regarding the Notice, and signed a last-chance agreement pursuant to which Solomon was not reduced in

grade. (*Id.* ¶¶ 61, 65-67.) Pugh had the authority to discipline David and Solomon, and he approved their final discipline. For purposes of Title VII, he was the common decision-maker.

### 2. Same Standards of Conduct

The similarly-situated requirement also demands that comparators be subject to the same standards as the plaintiff. *Weber*, 621 F.3d at 594. Whether two employees were subject to the same standards is not a rigid, mechanical test. *Coleman*, 667 F.3d at 848-49. The question is not whether the employer classified the comparators in the same way, "but whether the employer subjected them to different employment policies." *Id.*

Here, although David was a supervisor and Solomon a manager at the time they were disciplined, USPS rules against falsifying employee time entries and lying during a formal investigation are equally applicable. Indeed, Solomon's Notice of Proposed Reduction in Grade and David's Notice of Proposed Removal both cited the Postal Service's Employee and Labor Relations Manual as authority for the impropriety of Solomon and David's behavior. (Def.'s LR 56.1(a)(3) Ex. E1, Notice of Proposed Reduction in Grade, Ex. E3, Notice of Proposed Removal.)

Moreover, a proposed comparator's position or rank may be important, but only "*provided that the employer took these factors into account when making the personnel decision in question.*" *Eaton v. Ind. Dep't of Corrs.*, 657 F.3d 551, 559 (7th Cir. 2011) (emphasis in original). "A characteristic that distinguishes two employees, regardless of its significance when objectively considered, does not render the employees non-comparable if the employer never considered the characteristic . . . [because it] cannot provide any insight as to whether the employer's decision was motivated by discriminatory intent." *Id.*

Here, the summary judgment record provides no indication that Pugh considered job titles significant when deciding David and Solomon's discipline; he focused on responsibility. Pugh found it troubling that David would not admit to improperly changing time entries. (Def.'s L.R. 56.1(a)(3) ¶ 56.) He demoted her to mail handler because he thought that she could still be a productive USPS worker, but only in a position that did not involve the trust required of a supervisor. (*Id.* ¶ 58.) Similarly, Pugh signed a last-chance agreement with Solomon instead of demoting him because he believed that Solomon had provided him with complete and truthful information, admitted his wrongdoing, expressed remorse, and assured Pugh that he would never falsify time records again. (*Id.* ¶¶ 66-67.) There is no evidence that Pugh's decisions were based on David or Solomon's job titles. Thus, based on the summary judgment record, David and Solomon were subject to similar standards of conduct.

### 3. Conduct of Comparable Seriousness

Finally, a plaintiff in a disparate discipline case must show that the alleged comparator "engaged in comparable rule or policy violations" without differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Coleman*, 667 F.3d at 850 (quoting *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010)); *Weber*, 621 F.3d at 594. The Seventh Circuit has adopted the "comparable seriousness" standard under which comparators must have "engaged in similar – not identical – conduct to qualify as similarly situated." *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis*, 510 F.3d 681, 689 (7th Cir. 2007).

Here, the summary judgment record establishes that Solomon's conduct was not of comparable seriousness to David's because mitigating circumstances distinguished Solomon's conduct from David's. Although Solomon and David both falsified subordinate employee

timekeeping records and initially proffered false reasons for doing so, the similarities between their conduct end there. (Def.'s LR 56.1(a)(3) ¶¶ 44, 61-64.) After originally providing false information about the time-entry changes, Solomon provided truthful information about his conduct to the investigating OIG agents and to Smith, the USPS official who issued his Notice of Proposed Reduction in Grade. (*Id.* ¶ 64.) Additionally, when he appealed his proposed reduction in grade to Pugh, Solomon provided Pugh with information that Pugh believed was complete and truthful – Solomon admitted he was wrong for making the time-entry changes and expressed remorse. (*Id.* ¶¶ 65-66.) Based on Solomon's statements, Pugh reduced Solomon's proposed reduction in grade to a last-chance agreement pursuant to which Solomon kept his position as manager. (*Id.* ¶ 67.)

By contrast, David never provided investigators and supervisors with what they believed were truthful statements. On May 23, 2008, when OIG agents Goldsmith and Mundo interviewed David as part of their investigation into her TACS time-entry changes, David denied having an arrangement with craft employees to change their time to reflect a full day of work when the employees had left early. (*Id.* ¶ 25.) David also provided a written statement in which she denied any wrongdoing. (*Id.* ¶ 26.) On June 4, 2008, Goldsmith and Mundo again spoke with David after interviewing craft employees who told them that David allowed employees to leave early and would manually change their end-times. (*Id.* ¶¶ 27-29.) David again denied any wrongdoing. (*Id.* ¶ 29.) Believing that David was not telling the truth, they issued her a United States District Court Violation Notice, charging her with providing false statements during a time and attendance federal investigation. (*Id.* ¶ 30.) Rather than challenging the notice in court, as was her right, David paid the $75.00 forfeiture amount. (*Id.*)

Similarly, after the OIG agents provided David's supervisor, Davis, with a report of their investigation, Davis conducted his own investigation into David's alleged improper time-entry changes and concluded that David was paying employees for work that they did not perform and that she had lied to the OIG agents. (*Id.* ¶¶ 32, 34, 37.) Davis then issued David a Notice of Proposed Removal. (*Id.* ¶ 43.) There is no evidence that David ever admitted any wrongdoing to Davis. Instead, in a letter written by her representative to Davis, David again denied the charges and appealed the proposed removal to Pugh. (*Id.* ¶ 47.)

On December 12, 2008, David met with Pugh, but again never admitted to the improper conduct alleged in the proposed removal. (*Id.* ¶ 48.) After Pugh told her to confer in private with her representative and left the room, he returned, and David admitted to purposefully changing clock rings, but insisted that the changes were proper. (*Id.* ¶ 52.) She maintained that any time-entry changes she made were made to correct errors. (*Id.* ¶ 26.) But Pugh's own review of the case materials, including the sworn statements from the craft employees, led him to believe that David was not telling the truth and that she did, in fact, have an agreement with craft employees to pay them for time they did not work. (*Id.* ¶ 53.) Pugh found it troubling that David would not admit to improper conduct, so he demoted her to a mail handler. (*Id.* ¶ 56.)

In sum, David is not similarly situated to Solomon because David repeatedly denied improperly changing TACS time entries even though the OIG agents, Davis, and Pugh all believed that she had done so. Solomon, by contrast, after initially providing false statements about time-entry changes he made in TACS, provided investigators and his supervisors with what they believed were truthful statements. David's continued denials distinguish her conduct from Solomon's. *See Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) (plaintiff and co-worker not similarly situated because plaintiff's conduct lying about the

circumstances surrounding an accident until termination meeting was more serious than co-worker's conduct who rescinded his false statement about the incident sooner). Thus, David has failed to show that Solomon is an appropriate comparator and, therefore, has failed to establish a *prima facie* case of gender discrimination. Of course, the fact that Pugh believed Solomon's admissions but did not believe David's denials would not preclude Solomon from being a comparator if Pugh's rationale for doubting David was a lie, as David argues. But, as discussed below, nothing in the record supports this argument.

## B. Pretext

Under the *McDonnell Douglas* burden-shifting analysis, even if David could make a *prima facie* showing of gender discrimination, she can survive summary judgment only by proving that Defendant's legitimate, nondiscriminatory reason for demoting her is merely a pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 802-03. In this context, pretext "means a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000). If Defendant honestly believed the reasons it gave for demoting her, David cannot establish pretext, even if Defendant's reasons were mistaken, cruel, or downright irrational. *See Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006) ("the question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason *was* his reason: not a good reason, but the true reason.") (emphasis in original); *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) (noting that in an employment discrimination cases "we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what "*motivated* the employer.") (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983))

Here, Defendant contends that David was demoted because she falsified employee time entries and subsequently lied about doing so in a formal investigation. David argues that these reasons are pretextual and that she was really fired because she is a woman. David, however, has provided no evidence that Defendant did not honestly believe that David improperly changed TACS entries or that demoting her for that belief was inappropriate. OIG agents Goldsmith and Mundo, David's supervisor Davis, and Pugh all believed, after extensive investigation, that David improperly changed TACS time entries and lied about doing so. Additionally, Solomon, David's alleged comparator, was also disciplined for improperly changing TACS entries. (Def.'s LR 56.1(a)(3) ¶ 67.) Like David, whose proposed discipline was reduced one step from a removal to a demotion, Solomon's proposed discipline was reduced one step from a demotion to a last chance agreement. (*Id.* ¶¶ 59, 67.) Although David characterizes this as only "a slap on the wrist," Solomon still faced discipline for improperly changing TACS entries. (*Id.*, Ex. E2, Settlement and Last Chance Agreement 1.) Finally, it is undisputed that Pugh was involved in the removal of at least three supervisors, both female and male, for improperly changing TACS entries. (*Id.* ¶¶ 68-69; Ex. Q, John Calvin Letter of Decision – Removal.) Thus, David cannot establish that Defendant's nondiscriminatory reasons for demoting her were pretext for gender discrimination.

I. **Conclusion**

For the reasons herein, the Court grants Defendant's motion for summary judgment [22]. This case is hereby terminated.

**SO ORDERED**            **ENTER: 2/25/13**

*[signature]*
**JOHN Z. LEE**
**U.S. District Judge**